## Williams, et al. v. Board of Trustees Stanton Common School District.

(Decided February 6, 1917.)

### Appeal from Powell Circuit Court.

1. Schools and School Districts—Common School Funds—Unlawful to Use in Aid of Sectarian School.—Under section 189 of the constitution, no fund now existing, or that may hereafter be raised or levied for educational purposes, can be appropriated to, or used by, or in aid of, any church, sectarian or denominational school.

2. Schools and School Districts—County High Schools—Conversion of Sectarian School Into High School Illegal.—Any arrangement or contract between the board of education of the county or other

school authority by which ·a sectarian school is treated as a county high school and common school graduates allowed to attend it for a stipulated tuition fee paid by the board of education, is prohibited by the constitution and void.

3.  Schools and School Districts—Contracts Between Trustees of Graded School and Sectarian School—When Void.—A contract between the· trustees of a graded school and a sectarian school by which the sectarian school leased to the graded school two rooms in its school building, and turned over the control and supervision of the graded school to the president of the sectarian school, was void as in violation of the constitution.

4.  Schools and School Districts—Separation of Common School and Sectarian School.—The constitution not only forbids the appropriation for any purpose of the common school funds to sectarian institutions but it contemplates that the separation between the common school and the sectarian school shall be open, notorious and complete.

5.  Schools and School Districts—Union of Common and Sectarian School Forbidden Although Beneficial to Children of Common School.—The fact that under an arrangement between the common school and the sectarian school the common school gets the advantage of the services of teachers of the sectarian school and the children of the common school derive benefits from the union they would not otherwise have, or the fact that the arrangement is approved by a majority or all of the patrons of the common school, does not justify its existence or continuance.

6.  Schools and School Districts—Unlawful for Trustees of Common School to Enter Into Arrangements With Sectarian School.—It is a violation of the constitution for the trustees of any common or graded school or educational institution supported in whole or in part by public funds, to enter into contracts, agreements or arrangements through or under which such school may be brought directly or indirectly under the influence, control or supervision of any sectarian institution or school.

M. M. LOGAN, Attorney General, and HAYS & HAYS for appellants.

J. D. ATKINSON and C. F. SPENCER for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The important questions presented by this record for decision concern the school relations that may lawfully exist between the common school and the sectarian school, and the meaning of the constitutional provision that no part of the common school fund shall ever be used in aid of or for the use or benefit of a sectarian or denominational school.

The case comes up in this way: In January, 1915, the appellants, who will be called plaintiffs, and who are citizens and resident taxpayers in the Stanton graded common school district in Powell county, brought suit against the board of trustees of the Stanton graded common school district and the Board of Church Extension of the United Presbyterian Church of North America, J. C. Hanley, Elsie McDill and Ida Paisley. The petition as amended averred, in substance, that the Board of Church Extension of the United Presbyterian Church of North America was a corporation, of which the defendant, J. C. Hanley, was president; that the Stanton graded school is a part of the common school system of the state, organized under the general school laws of the state. That the Board of Church Extension, as it will for brevity be called, was organized for the purpose of teaching and spreading the ecclesiastical polity of the Presbyterian church. That it had acquired school grounds situated within the graded common school district and had, about 1908, erected thereon a school building or college for the purpose of teaching school, wherein it taught the tenets of its creed, mode of worship and ecclesiastical polity. That Hanley was and had been the president of the school, directing its operations, and had under his control five or six teachers selected and employed by the Board of Church Extension, all of whom are teaching, have been teaching, and will continue to teach the common school branches of learning and other liberal education and the religious tenets and dogmas of the Presbyterian church. That the trustees of the Stanton graded school and the Board of Church Extension, through its president, and the defendants, Elsie McDill and Ida Paisley, teachers in that school, had wrongfully and unlawfully entered into a contract, by the terms of which the trustees of the graded school leased the grounds and school building of the Board of Church Extension situated in the graded school district for the year ending June, 1915, for the purpose of having conducted therein the graded common school of the district under and in accordance with the laws of the state of Kentucky. That the trustees entered into a contract with Elsie McDill and Ida Paisley by which they were employed to teach the graded common school in the district for the year ending in June, 1915, and agreed to pay them as teachers of the

graded school, and also pay the Board of Church Extension for the use of its college building and grounds out of public money belonging to the graded common school district for the school year.

That the trustees of the graded school failed and refused to maintain a graded common school in accordance with the law. That they had employed only two of the six teachers employed to teach in the graded school. That they had no control over four or five of the teachers engaged in teaching in the school. That the school, its buildings and grounds were under the control of the Board of Church Extension through President Hanley. That, in fact, all of the money arising from taxation for the benefit of the graded school and set apart by law for its maintenance was being diverted from its public use and used in the maintenance and aid of the sectarian school belonging to the Board of Church Extension. That for three or four years prior to 1915 the graded school had been conducted in all respects as hereinbefore set out under agreements and arrangements made and entered into between the trustees of the graded school and the Board of Church Extension.

The prayer of the petition was that the board of trustees of the graded school be perpetually enjoined from using any of the public funds belonging to the district for the maintenance of or in aid of the school owned by the Board of Church Extension. That they be compelled to maintain and cause to be conducted under and in accordance with the laws of the state a graded common school in the district and be enjoined from entering into any contracts, agreements or understandings with the Board of Church Extension, or the president of its school, located at Stanton, and for all proper relief.

The defendants joined in an answer in which every material averment of the petition was specifically denied, but in an amended answer the trustees of the graded school admitted that they did, in September, 1914, enter into a lease contract with the Stanton Collge—the school conducted by the Board of Church Extension—for the use of its building and grounds, consisting of about ten acres, for one year, the same to be used for school purposes only, and in consideration therefor agreed to keep up the repairs and incidental

expenses attached to the buildings and grounds. That they also entered into a contract with the defendants, Elsie McDill and Ida Paisley to teach the Stanton graded school for the school year ending June, 1915.

Filed with answer is a copy of the contract made be-. tween Stanton College, by Hanley, its president, of the one part, and the board of trustees of the graded school, by their chairman and secretary, of the other part. This contract, which was entered into on December 5, 1914, stipulates that in consideration of the board of trustees keeping up the repairs and incidental expenses attached to the buildings and grounds, the Stanton College had leased to the board of trustees the buildings and grounds, consisting of about ten acres, for a period of one year.

There is also filed with the answer a copy of the contract entered into between the trustees of the graded school and Elsie McDill and Ida Paisley as teachers in said school. This contract reads as follows: "This article of agreement made and entered into this the 5th day of September, 1914:

"Witnesseth: That ............................................................. of ............................................. holding ............................................ which authorizes ............................................ to teach in the common schools of Powell county, Kentucky, has contracted with the board of trustees of the Stanton graded school, of Stanton, Kentucky, to teach the white graded school in said district for the term of ........................ months, beginning on the ............................ day of September, 1914, in accordance with the school laws of the state of Kentucky, and the rules and regulations prescribed by the State Board of Education of said state, and the rules and regulations prescribed by said board of trustees and county superintendent, in pursuance to said laws, for the period of ............................ for the sum of $ ........................, this being $........................ per month.

"The said teachers hereby hold themselves subject to the legal supervision of the said board of trustees of said graded school, and the county and state superintendents, and to the visitations of the county, state and graded school representatives. The graded school board of trustees reserving the right to dismiss said teachers at any time whatever, for any of the causes specified in the school laws of the state." This contract with the blanks shown in it was signed by the chairman

of the board of trustees of the graded school and Elsie McDill and Ida Paisley.

A reply, which controverted the averments of the answer, completed the pleadings.

After the pleadings had been made up, evidence in behalf of the respective parties was taken, and upon the submission of the case, there was a judgment dismissing the petition, followed by this appeal.

In order that there may be a clear understanding of the case, we will set out at more than ordinary length the substantial facts the evidence conduces to establish.

James Williams, one of the plaintiffs, testified that the Stanton graded common school was taught in the school building owned by the Board of Church Extension, and that although he was a resident of the graded school district, he did not send his children to the graded school during the school year of 1914-1915 because he was conscientiously opposed to the doctrines taught by the Presbyterian church.

Ida Paisley, one of the teachers, said that her residence was in Ohio. That she saw an advertisement in a paper called The Presbyterian, signed by J. C. Hanley, president of Stanton College, and in response to this advertisement made application for a position as teacher. That she had no acquaintance with and had never heard of any of the board of trustees of the graded school before she came to Stanton from her home in Ohio following arrangements made between herself and J. C. Hanley. Putting her testimony in narrative form, she said: "When I arrived at Stanton I accepted a position under the Stanton school board. I knew that I was going to teach the sixth and seventh grades in the Stanton graded school when I came. Mr. Hanley wrote me and told me that I might probably have the sixth and seventh grades. Mr. Hanley wrote to me to come. He said the salary would be probably fifty dollars a month. I have no contract with Mr. Hanley. Before the school began I entered into a contract with Mr. R. C. Hall, chairman of the board of trustees, but the contract does not show the time the school would begin or end or the amount I would receive per month. I was paid $67.50 per month by the board. At the time I signed the contract I was at Mr. Hanley's and it was handed to me by him. I have never met with the board of trustees of the graded school at any time since I have

been here—her deposition was taken in May, 1915. There are eight teachers in the college. All but two of them are United Presbyterians; one of those two is a Presbyterian."

Miss McDill, whose deposition was taken in May, 1915, testified that she was a resident of the State of Ohio, and was entering on her third year as teacher at Stanton. That when she first came to Stanton to teach she applied to Mr. Hanley but was later employed by the graded school board. That she was in Mr. Hanley's house when the contract with the Stanton graded school board was brought to her by Mr. Hanley. That no one of the board had ever said anything to her about teaching, nor did she ever go before the board to make a contract with them. That the only contract she had was the contract, a copy of which was filed with the answer, which did not specify when the school would begin or how many months it would run or when it would end or what she would receive as compensation. That she did not get any information from the trustees of the school concerning the amount she would receive for her services. That Mr. Hanley told her the grade she would teach and the length of time and also the salary that she would receive. That in the preceding eight months only one of the trustees visited the school and he made only one visit. That there were students attending the Stanton College who belonged to other churches than the Presbyterian and that children who were members of other churches did not attend service or Sunday School at their churches but attended the United Presbyterian preaching and Sunday school. That she was paid for her services as teacher by the check of the county superintendent of schools.

She further said that she filed a written application with the graded school board for the position of teacher during the term beginning September, 1914, and understood that the information she received from Mr. Hanley concerning her salary had come to him from the school board. That she never interfered with the desire of the students to attend any church they wished, and that occasionally some of the pupils of the Stanton College attended the Christian church. That there was no particular form of religion or mode of worship taught in the Stanton graded school or in Stanton College so far as she knew. That she never knew of any

of the pupils boarding at the dormitory of the Stanton College voluntarily going to the Christian church. She said she exercised her influence with the children and the people generally who were not connected with the Christian church to attend the United Presbyterian Sunday school and church, and that all the faculty of the Stanton College were Presbyterians. That when there were no services at the Presbyterian church the teachers and pupils from the dormitory went to the Christian church.

She was asked and answered these questions: "Q. Isn't it a fact that on certain Sunday nights the United Presbyterians go to the Christian church to the meeting of the Endeavor Society, and after the society is over, get up in a body and leave the house when preaching is to be there? A. It is very true that they have left after the Endeavor meeting to return to the United Presbyterian service."

J. D. Atkinson said that he was a member of the board of trustees of the graded school and secretary of the board. That the board elected its teachers, Misses McDill and Paisley, for the year ending June, 1915. That he visited the graded school and each room therein and kept in touch with the teachers, Misses McDill and Paisley. He said that when the question of employing teachers for the school year 1914-15 came up, the board discussed the matter, and as they knew Miss McDill, who had taught the year before, and her work had been satisfactory, they employed her, and asked Mr. Hanley to get them a teacher in the place of a Miss Kable who had taught the year before. That he drew the contract filed with the answer but was not present when it was signed by either Miss McDill or Miss Paisley, and they told him afterwards that they had signed the contract. That the contract did not specify the salary because the board did not know what the available funds would be. That the graded school received from public sources something over $1,400 annually.

J. C. Hanley said that he was a minister of the gospel, and had been president of the Stanton College for five years. That the building cost between fifteen and twenty thousand dollars, not including furnishings and equipment, and was a building well adapted to school purposes. He said he had no official connection with the Stanton graded school and received no part of the

school fund. That he had an arrangement with the county board of education by which Stanton College took care of pupils who came from the rural districts to take the high school course. That there had never been any religious doctrines or particular modes of worship taught in the college. That Stanton Collge did not receive anything from the common school fund. That Stanton College employed seven teachers, and that some of the teachers of Stanton College gave a good deal of their time to teaching the graded-school children. That there were posted in the dormitory of Stanton College, rules, one of which read, "Church and Sabbath school and attendance will be required of all students. Church and Sabbath school at the U. P. church will be required services. Students will be assigned a section of the house in which to sit and will be expected to occupy that place."

Miss Bohannon, superintendent of common schools of Powell county, was asked and answered these question: "Q. Has Powell county under the recent laws governing the state established a high school for the county? A. Yes, we have a county high school, but we have no high school building and have no teachers employed to teach said school. Q. How do you have a county high school without a building or the employment of teachers? A. We have an arrangement with the Stanton College whereby the county board of education pays it two dollars per month per pupil, and the Stanton graded school has a contract with it whereby the school may be taught in the Stanton College building. Q. What has been the expense to the county of Powell for the present year's high school as conducted by the county board of education? A. $54, I think. Q. Does the high school department of Stanton College teach all students in the branches required to be taught in the county high school? A. Yes, sir. Q. Was there any religious doctrine or mode of worship taught in the high school department or in any other department of the Stanton College? A. No, sir." She further said that Miss Thompson, although not employed or paid as a common or graded school teacher, taught in the graded school and that Miss Thompson was one of the teachers of Stanton College. She further said that the county board of education had an arrangement with the Stanton graded school by which common school pupils all

over the county who were entitled to do so could enter for $2.00 a month per pupil the high school conducted by Stanton College.

John Williams, one of the trustees of the Stanton graded school, said that he supposed Mr. Hanley was at the head of the school. He was asked and answered these questions: "Q. How did you let Prof. Hanley and the other five or six teachers out there teach the children of the Stanton graded school? A. If he wanted to employ teachers to teach the children in the different classes, I don't know that we had any objection. Q. The fact was the arrangement you made out there was to further the cause of that school out there and have your school taught in what you thought was the best way? A. Yes, sir. Q. Mr. Hanley was really the head of the school? A. I considered him so. Q. Didn't he recom-. mend all the teachers or employ all that were employed? A. I don't know whether he employed all. He employed two of them. Q. How many years has the graded school been conducted out at the college? A. Four or five years. Q. You knew that the children here in the district were mixed through the school and under all the teachers? A. That was my understanding—according to their grades."

R. C. Hall, one of the trustees, said he had been a trustee of the graded school for ten years. That he had never met Miss Paisley but had known Miss McDill for some time. That the school was practically in charge of Prof. Hanley. He said he had heard some complaint on account of the connection of the graded school with the Presbyterian school. That teachers employed by Stanton College taught in the graded school but they were not paid for teaching out of the school fund.

Charles M. Crowe, who for seven years had been a pupil in the Stanton graded school and afterwards was graduated from the high school conducted by Stanton College, testified as follows: "Q. The Stanton College and the Stanton Common Graded School are merged and both were taught for this school year in the Stanton College building, were they not? A. They were taught in the Stanton College building; whether or not they were merged, I do not know. Q. You have stated you got your diploma from the Stanton College this year. Now, please give us the definition or meaning of the

word "merged." A. What I took as the definition of "merged" was run in one body and in co-operation with one another. Q. Who was the president of the whole school; Stanton graded school and high school both? A. I don't know. Q. Wasn't J. C. Hanley president and presided over and had control of both schools? A. I do not know. I suppose he presides over them. Q. Who else besides Hanley, if anybody, assumed to have the management and control of both schools? A. No one that I know of."

Dr. Johnson, one of the trustees of the graded school, said that the pupils in the graded school were given the privilege of attending the school taught by Stanton College teachers. And he named several of the Stanton College teachers who taught graded school pupils. He said they had instructed the graded school teachers to accept the arrangement with Stanton College by which the pupils could have free teaching from the Stanton College teachers. That he understood they were getting a lot of free teaching out there but did not know who was paying for it. That Dr. Hanley said he would allow the graded school pupils in grades under the grades taught by the two graded school teachers to attend his school without cost to the board.

There is also incorporated in the evidence of this witness, who said he was a member of the graded school board in 1912, a resolution of the board directing the payment to Mr. Hanley of $164.00 for high school pupils for the year ending in 1912. There was another resolution directing the payment of $783.60. He said he knew that was not a legal arrangement. It further appears in his evidence that in 1913 there was paid for tuition of high school pupils $280. That to cure the illegality of the arrangement between Stanton College and the graded school that existed in 1912-13 the present arrangement was made.

Miss Bertha Carver said she was a teacher in Stanton College employed by Prof. Hanley, and had charge of the primary department. That a majority of the children in her department were children coming from the Stanton graded school. She further said that she had the first and second grades in Stanton College and that Miss Thompson had the third and fourth. That the children in these grades came mostly from the graded school district. That she was paid for her ser-

vices by Mr. Hanley. That all the other teachers in the college building taught children coming from the graded school district. That all the children attending the college as well as the graded school were graded, and the teachers in the building, including the Stanton College teachers, seven or eight in number, all had children that came from the Stanton school district. That Dr. Hanley would announce that any of the pupils of the graded schools who wished to attend the grades in the college could do so, but it was not compulsory.

This evidence shows without contradiction: (a) that Stanton College is a purely sectarian institution, under the sole control and management of the Presbyterian church; (b) that in addition to the grounds, it owns a large and well-equipped school building, and employs some seven teachers, all of whom are under the control and authority of J. C. Hanley, a Presbyterian minister and educator in charge of the institution; (c) that the graded school has no school building, and under its contract with Stanton College the graded school pupils, together with the two graded school teachers, occupy two rooms of the college building; (d) that these two teachers teach only the sixth, seventh and eighth grades, the other grades being taught by Stanton College teachers; (e) that all graded school children have the privilege of attending Stanton College and being taught by the college teachers; (f) that county high school pupils attend Stanton College through some arrangement made between the graded school, the county board of education and Stanton College through which Stanton College received a tuition fee for high school pupils from the board of education out of the public school fund; (g) that the graded school trustees propose to continue the existing arrangement with the Stanton College, as they regard it as beneficial to the graded school pupils, and for the best interest of the graded school; (h) that the arrangement between the graded school and Stanton College is satisfactory to a large majority of the patrons of the school, but that some of the patrons who are not Presbyterians object to the graded school being conducted in connection with, and under the control of, the president of Stanton College; (i) that previous to 1915 several hundred dollars from the common school fund was paid to Stanton College under a contract existing between the graded school and Stanton College, and to

avoid this open violation of the Constitution and laws of the State the scheme in force when this suit was brought was adopted; (j) that the pupils attending Stanton College were taught in other rooms of the college building not occupied by the graded school pupils; (k) that excepting what was paid for repairs and expenses in taking care of building and grounds neither Hanley, Stanton College nor the college teachers received any part of the graded school fund; (l) that the rules and regulations for the government of Stanton College, among other things, provide that ''Church and Sabbath school attendance will be required of all students. Church and Sabbath school at the United Presbyterian church will be required services. Students will be assigned a section of the house in which to sit and will be expected to occupy that place''; (m) the evidence further conduces to show that the teachers and pupils of the graded school conducted in the college building are really as much under the control of Mr. Hanley as the teachers and pupils of Stanton College; (n) that the graded common school trustees have virtually surrendered to Mr. Hanley all control over the conduct and management of the graded school; (o) that the two graded school teachers, although nominally contracted with by the graded school trustees and paid out of the common school fund, were really selected by Mr. Hanley.

What amount of the common school funds received by the graded school is paid out under the contract between the graded school and Stanton College in keeping up the repairs and incidental expenses attached to the building and grounds, is not disclosed by the evidence, but it is a fair assumption that these repairs and expenses require quite a considerable expenditure. It may further be assumed that the arrangement is entirely satisfactory to the Board of Church Extension and Mr. Hanley.

The evidence discloses, and we may freely admit, that Mr. Hanley is a fine type of Christian gentleman and an educator of ability and experience, and that graded school children have many educational advantages under the arrangement with Stanton College that they would not enjoy if the graded school were conducted independent of the college.

Let us now apply to the facts and our conclusions thereon the law that is applicable as we understand it, with a view of determining whether the arrangement between Stanton College and the graded school is authorized by or in violation of the Constitution and laws of the state, as well as the settled public policy of the state.

The constitution provides in section 189 that: "No portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian or denominational school." And in section 5, which is a part of the bill of rights, that: "No preference shall ever be given by law to any religious sect, society, or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, cr in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience."

In reference to county high schools, section 4426a, subsection 8, of the Kentucky Statutes, provides for the establishment of high schools in each county by the board of education, and authorized the board of education to make provision for defraying the expense of conducting such high schools, and further gives the board of education the authority to enter into a contract with the authorities of any city or town, under which high school pupils will be admitted to the public schools of such cities or towns. And, although the board of education of Powell county is not a party to this suit, and the validity of the arrangement between it, the Stanton graded school and the Stanton College, under which the board of education has created Stanton College a county high school and pays to it tuition for county high school pupils, is not directly involved, we may with propriety say in passing that the admitted arrangement between the board of education of Powell county and Stanton College, under

which Stanton College was created a county high school and paid by the board of education out of the common school funds tuition fees for county high school pupils, is a flagrant violation of section 189 of the constitution, because plainly under the very letter of this section common school authorities have no right or power to enter into any agreements, arrangements or contracts with a sectarian institution by which in consideration of the payment of a part of the common school fund to the sectarian institution it will furnish tuition to common school pupils.

We feel more at liberty to make this passing comment because the evidence shows that the Stanton graded school is in some way a party to the plan by which Stanton College has been designated as a county high school.

Section 4481 of the statute makes it the duty of the boards of trustees of graded common schools to purchase suitable grounds and erect suitable school buildings in which the graded school may be conducted, and gives the trustees ample power to levy such taxes as may be necessary to provide grounds and buildings, as well as equip and maintain the school.

Without setting out further sections of the statute, it may be stated generally that an elaborate statutory scheme has been adopted for the purpose of affording an education to the children of the state at common schools maintained by state funds, supplemented by local taxation. These statutes further give the trustees of common as well as graded common schools the largest power to enable them to provide grounds and erect, equip and maintain sufficient buildings to accommodate and educate the school children. Following the constitutional mandate, there will be found running through this entire statutory educational structure the prominent thought that money raised from whatever source for common school purposes must be devoted exclusively to those purposes, and that the school authorities must provide grounds, buildings, equipment and teachers sufficient to afford an education to all children of the state who desire to attend the common school.

It might further be said in this connection that the elaborate care with which the sections of the constitution quoted were drawn shows how firmly fixed was the opinion of the members of the convention that no part of the

common school fund should ever be at any time or in any way diverted from the common school purposes of the state as these purposes have always been understood to exist, or "appropriated to, or used by, or in aid of, any church, sectarian or denominational school." To emphasize, if emphasis were necessary, and to remove any possible doubt that might exist as to the determined purpose to forever preserve inviolate for the use of the common schools of the state the school fund of the state, and to keep the common schools of the state thoroughly separate and distinct from any denominational or sectarian church or school, section 5 was incorporated into the bill of rights, fixing the principles therein announced as among the inherent and inalienable rights of the citizens. Without needlessly repeating section 5, it may not be inappropriate to again reiterate the declaration taken from it that: "No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed. . . . ." And so carefully have these constitutional mandates been observed by the common school authorities that the questions here involved have seldom come before the court for adjudication, although in a few cases the inviolability of the school fund for the purposes for which it was dedicated has been confirmed. Halbert v. Sparks, 9 Bush 259; Auditor v. Holland, 14 Bush 147; Collins v. Henderson, 11 Bush 74.

In Hackett v. Brooksville Graded School District, 120 Ky. 608, the question whether it was permissible under section 5 of the constitution to open public schools with prayer and selections from the Bible was presented, and it was held that it was.

In McDonald v. Parker, 130 Ky. 501, the superintendent of county schools in Knox county refused to pay to the treasurer of the graded school district the school funds to which the graded school was entitled, upon the ground that the trustees of the graded school had made a combination with Union College, a sectarian institution, in violation of the provisions of section

189 of the constitution. It appears from the opinion that Union College suffered a disastrous fire, which misfortune made it impossible to open the institution until the burned building could be rebuilt, and the trustees of the institution found themselves with more teachers on their hands than they could utilize in teaching the student body. After the fire the faculty of Union College opened negotiation with the trustees of the graded school that contemplated some sort of fusion between the two institutions which would be mutually advantageous, but this idea was abandoned. Afterwards, however, one of the teachers who had intended to teach in Union College but could not do so on account of the destruction of the building, resigned his position as teacher with Union College and was employed to teach the graded school in connection with other teachers employed by the graded school. It also appears that the services of two of the Union College teachers, who did not have certificates qualifying them to teach in the public schools, were donated by Union College to aid and assist in teaching the graded school children in the building owned by the graded school, without any cost to the graded school. The donation of the services of these two teachers was seized upon by the county superintendent of schools to justify his refusal to pay the graded school the public money to which it was entitled, as illustrating that an unlawful agreement had been entered into between Union College and the trustees of the graded school. But the court, in denying the sufficiency of this reason to defeat the right of the graded school to receive the public money to which it was entitled, said that the provisions of the statute did not forbid the trustees to accept the aid of teachers whose services were given gratuitously, and further said: "We have read this record several times with the utmost care and have failed to find the slightest evidence of any intention to pay one cent of the fund involved here to Union College or to any one connected therewith. . . . . Nor do we think the evidence in this case authorizes the inference that there was any connection, direct or indirect, near or remote, between Union College and the graded schools." The material difference between that case and the one we have is too obvious to need pointing out.

Counsel for appellees rest their argument for the affirmance of the judgment below holding that the arrangement between Stanton College and the trustees of the graded school was not prohibited by the constitution or laws of the state, upon the ground that the evidence shows that no part of the public fund set apart for the use of the graded school was paid to Mr. Hanley or any of the Stanton College teachers for the services rendered by them in teaching the children of the graded school. But we do not think the validity of this arrangement is to be tested alone by the circumstance that no part of the public fund was paid to the teachers of Stanton College, although the admission of the circumstance would at once put beyond doubt the unlawfulness of the arrangement.

It is not essential to the invalidity of agreements between a sectarian school and a common school that it should be shown that any part of the common school fund was paid to the sectarian institution. To so hold would be too narrow a view to take of the broad import of the constitution and does not fairly interpret the spirit of the prohibition against the union of church and school. The constitution not only forbids the appropriation for any purpose or in any manner of the common school funds to sectarian or denominational institutions, but it contemplates that the separation between the common school and the sectarian or denominational school or institution shall be so open, notorious and complete that there can be no room for reasonable doubt that the common school is absolutely free from the influence, control or domination of the sectarian institution or school. And if the arrangement between Stanton College and the graded school should be subjected to the scrutiny of this not too comprehensive or rigid test, the evidence makes it plain that it was of such a nature as to reasonably create the belief that the graded school trustees had abdicated all control and authority over the graded school and delivered its conduct entirely to Mr. Hanley, the head of the sectarian institution.

It may be true, and we are not disposed to doubt it, that the plan under which these two institutions operated was very beneficial to the children enrolled in the graded school, and that under its operation they derived moral as well as educational advantages that could not

be secured if the graded school were conducted as an independent institution entirely free from the control or supervision of Stanton College or its public spirited president. But no odds how beneficial to the graded school or children the scheme may have been, it cannot be doubted that it was opposed to the spirit of the laws, and its invalidity is not to be condoned because the trustees of the graded school and a majority of the patrons of the school approved it. If it had the approval of all the patrons and all the children, it would yet be open to the condemnation that it was in violation of the constitution as well as antagonistic to the public policy of the state.

The trustees seem to have had the impression that because the arrangement was a good thing for the graded school, no one else should question its propriety; but the trustees of graded schools should not forget that these schools, as well as all common schools, are state not local institutions and the people of the whole state are concerned in everything that affects any one of them either for good or evil.

To authorize the validity of this arrangement here in question would be to encourage the creation of other like arrangements between other graded and common schools and other sectarian institutions, and presently we would have the common schools here and there throughout the state operated in connection with that denominational school that happened to have the largest influence and membership in the particular community where the union was made. That such a course would surely create deep and bitter resentment and dissatisfaction among many people and in many parts of the state, and result in lasting injury to the common school system, must be admitted when thought is given to the religious sentiments and prejudices entertained by large numbers of our people that manifest themselves in many different forms of expression.

One phase of this strong sectarian sentiment finds ample and widespread illustration in the well-known fact that there are thousands of good men and women who will not send their children to any school that is controlled by or under the influence of a denominational institution or church that teaches doctrines or indulges in forms of worship that do not meet their approval. To compose this uneasy spirit that was abroad in the land,

to quiet the conscientious scruples of those justly opposed to forced contributions in aid of sectarian institutions and save the common school from denominational criticism and attack, the prohibition against the union of church and school found voice in the organic law, and its pronouncement must be scrupulously adhered to so that no parent anywhere in the state may have it to say, as did one of the plaintiffs in this case, that he would not patronize the common school in his neighborhood because it was under the control of a religious body whose tenets or practices he could not accept.

The common school, however humble its surroundings, or deficient its curriculum, is the most valuable public institution in the state, and its efficiency and worth must not be impaired or destroyed by entangling it in denominational or sectarian alliances. As an independent, non-sectarian unit, it is entitled to the sincere and energetic support of all the people of the state, as well as to the hearty good will of all classes, irrespective of their religious views or church affiliations, and this on account of the inestimable blessing it confers on thousands of girls and boys in affording them the only opportunity for acquiring an education that could come within their reach; and if it is to live and grow in usefulness and strength, as it will surely do, the spirit of the constitution must pervade its life and leave no man to say it has lost its carefully builded and jealousy protected undenominational and non-sectarian character. This school system derives its support from the communicants of all churches, without being subservient to any of them, and its integrity and its safety depend on a strict adherence to the principle of separation of church and school not only according to the letter but to the spirit of the constitution.

Having these views, and to make clear and certain our determination to preserve the spirit of the constitution in its efforts to keep separate church and school, we not only hold that it is a violation of the constitution to appropriate any part of the common school fund, "in aid of any church, sectarian or denominational school," but equally unlawful for the trustees of any common or graded common school or educational institution supported in whole or in part by public funds raised by taxation or dedicated to common school purposes to enter into any contracts, agreements or arrangements

through or under which such school or educational institution may be brought directly or indirectly under the influence, control or supervision of any denominational or sectarian institution or school.

Wherefore, the whole court sitting, the petition for a rehearing is sustained and the former opinion that may be found in 172 Ky. 133, affirming this case, is withdrawn, and the judgment is reversed, with directions to enter a judgment cancelling the contract between Stanton graded school and Stanton College and enjoining the board of trustees of Stanton graded school from conducting the graded school in a school building or buildings owned, controlled or occupied by Stanton College for its educational purposes. But the judgment entered will not be enforced until the close of the school year of 1916-17, to the end that the studies of the children attending the graded school may not be disturbed or broken up, as they probably would be if the judgment were presently enforced.