CHIEF JUSTICE RABNER delivered the opinion of the Court.
*994 **547 From 2012 to 2015, Morris County awarded $4.6 million in taxpayer funds to repair twelve churches, as part of a historic preservation program. This appeal raises two questions: whether the grant program violated the Religious Aid Clause of the New Jersey Constitution and, if so, whether the Religious Aid Clause conflicts with the Free Exercise Clause of the United States Constitution.
The Religious Aid Clause has been a part of New Jersey's history since the 1776 Constitution. The clause guarantees that "[n]o person shall ... be obliged to pay ... taxes ... for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry."
**548 N.J. Const. art. I, ¶ 3. The clause reflects a historic and substantial state interest. We find that the plain language of the Religious Aid Clause bars the use of taxpayer funds to repair and restore churches, and that Morris County's program ran afoul of that longstanding provision.
Morris County and the grant recipients claim that to withhold grants from eligible churches would violate their rights under the Free Exercise Clause of the First Amendment. The County and the churches rely heavily on Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017), for support.
In the case before us, all of the churches have active congregations, and all have conducted regular worship services in one or more structures repaired with grant funds. Several churches specifically explained that they sought funds in order to be able to continue to host religious services. We do not believe Trinity Lutheran would require that grants be considered and extended to religious institutions under those circumstances.
We therefore reverse the trial court's decision to uphold the grants.
I.
A.
In 1992, the voters of Morris County approved a referendum to create a trust for open space and farmland preservation. The trust was funded by a county property tax. Ten years later, the voters authorized the County Freeholder Board to permit historic preservation funding under the trust. Today, the trust is known as the Morris County Open Space, Farmland, Floodplain Protection and Historic Preservation Trust Fund.
At the time of the grants in question, the trust considered applications to stabilize, repair, rehabilitate, renovate, restore, improve, protect, or preserve historic properties. To be eligible for consideration, a property had to be located in Morris *995 County and **549 either be listed on the National or New Jersey Register of Historic Places or be eligible for listing by the State historic preservation office.
Only four kinds of entities could apply for grants: municipal governments within Morris County; Morris County government; charitable conservancies whose purpose includes historic preservation; and religious institutions.
A review board evaluated applications and made recommendations to the Freeholder Board. Among other things, the review board considered the significance of the property, its physical condition and proposed use, the applicant's ability to match the funds requested, and the project's relationship to heritage education and tourism.
The Freeholder Board approved final awards. For religious institutions, grants could fund assessment reports, preparation of construction documents, construction projects for a building's exterior as well as its mechanical, electrical, and plumbing systems, and other items.
Certain conditions applied to grant recipients. Successful applicants that received construction grants of more than $50,000 cumulatively, over any number of funding cycles, had to execute a thirty-year easement agreement with the County. The "easement is a deed restriction that is used to assure long-term preservation of a historic property through proper maintenance and by limiting changes in use or appearance and preventing demolition of the property."
Grantees were also required to provide public access to properties that received grant funds. The County and the grant recipient were to "negotiate the days and hours that the property [would] be open to the public."
All work on a project had to be completed within two years once a grant was awarded; a one-year extension could be sought. Applicants who received funding also had to list their property on the National and New Jersey Registers of Historic Places.
**550 B.
From 2012 to 2015, the Freeholder Board approved a total of $11,112,370 in grants from the trust fund. The Board awarded $4,634,394, or 41.7 percent, to twelve churches. The grants funded the preparation of construction documents and plans, and the restoration of church buildings, towers, parish houses, windows, and other items.
According to the parties' joint statement of stipulated facts, all twelve churches "have active congregations" and all "have conducted regular worship services in one or more of the structures" for which grant funds have been or will be used. All twelve houses of worship are Christian churches.
In addition to the stipulation, the record also includes the grant applications that the churches submitted, which detailed how the requested funds would be used and why they were needed. Several successful applicants specifically stated that funds were needed to allow the church to offer religious services. The Presbyterian Church in Morristown, for example, sought funds to restore the exterior of its chapel. The Church explained that a grant would "historically preserve the building allowing its continued use by our congregation for worship services as well as by the community and many other outside organizations that use it on a regular basis." The Church received a preservation grant to repair the chapel's roof and the air shaft in the church building; to pay for finishes, moisture protection, and other costs; and to finance interior carpentry, masonry, and concrete work.
*996 The Church of the Redeemer received grants for the restoration of the exterior of its church building and parish house. As to the building, the Church wrote in its application that "[t]he impact of restoring the large slate roof and tower is entirely positive. It will restore a key structural element that has failed and assist in assuring that the building can continue in its existing use as a church and as an important building in Morristown."
**551 Saint Peter's Episcopal Church of Morristown sought and received funds to repair the interior of its church tower. The Church observed that the funding would "ensure continued safe public access to the church for worship, periods of solitude and meditation during the week, and several concerts throughout the year, as well as the treasures the church and tower contain."
The First Baptist Church of Ledgewood received funds to create preservation plans, in particular, for "the tower, heating system, and the original stained glass window." The application noted that "[p]reservation of the Ledgewood Baptist Church will enable the congregation to continue to provide religious and community activities to the county's diverse population."
At least one application reveals that grant funds financed the restoration of religious imagery. The First Presbyterian Church of Boonton received funds to restore its "Rose Window" and "Walk to Emmaus" window.[1] Interior photos of both windows are in the record. The Rose Window is above the entrance to the chapel; the "long, arched" Emmaus Window is located directly in front of the altar and depicts Jesus and two disciples. The Church explained in its application that "[p]reservation and repair of stained glass windows increase the beauty and the ambiance of the structure, as viewed from inside and outside." It is not clear from the record whether the stained glass windows at the First Baptist Church of Ledgewood, noted above, depict religious images.
C.
On December 1, 2015, the Freedom from Religion Foundation (FFRF) and David Steketee, a member of the group and a Morris County resident and taxpayer, (plaintiffs), filed a complaint in Superior Court. The complaint named the Freeholder Board, the review board, and the Morris County Treasurer, in his official capacity, (collectively, Morris County), as defendants. Plaintiffs **552 asserted that the grants were unconstitutional and violated Steketee's substantive constitutional rights under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).
Defendants removed the matter to the United States District Court for the District of New Jersey. The District Court later granted plaintiffs' motion to remand the case to state court. The court observed that plaintiffs "opted to allege a violation of their state rights, placing this case squarely within the state court," and explained that "[a]lthough Defendants' arguments center around potential federal defenses they may raise, that does not bring Plaintiffs' original cause of action within [federal] jurisdiction." After the remand, plaintiffs amended the complaint to include the grant recipients-the twelve churches-as defendants (Churches).
All parties moved for summary judgment. On January 9, 2017, the trial court granted defendants' motion and denied plaintiffs' cross-motion.
In a statement of reasons, the trial court noted that the case implicated several provisions *997 of the New Jersey Constitution and centered on the Religious Aid Clause. The court concluded "that the only thing that is clear about [the Religious Aid Clause's] intended meaning is that it is not meant to be read literally" and that the grants were examples of "benevolent neutrality" on the part of the government, consistent with "the spirit of our state and federal Constitutions." For support, the court relied on Resnick v. East Brunswick Township Board of Education, 77 N.J. 88, 389 A.2d 944 (1978), Everson v. Board of Education of Ewing, 133 N.J.L. 350, 44 A.2d 333 (E. & A. 1945), aff'd, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and American Atheists, Inc. v. City of Detroit Downtown Development Authority, 567 F.3d 278 (6th Cir. 2009), which are addressed below.
"[T]o correctly interpret the meaning of [the Religious Aid Clause] in this particular instance, given these particular facts," the trial court found that the provision must be read "in conjunction with the State's longstanding tradition of neutrality in church-state relations ... and the adoption of pro-neutrality provisions of **553 the State Constitution, such as Art. I, Para. 4 and 5." The court added that the Religious Aid Clause "must also be harmonized with" provisions in the Constitution that allow for eminent domain and the funding of historic preservation.
The court also noted that "[e]xcluding historical churches from receipt of reimbursements available to all historical buildings would be tantamount to impermissibly withholding ... general benefits to certain citizens on the basis of their religion," contrary to federal law.
We granted plaintiffs' motion for direct certification. 230 N.J. 478, 169 A.3d 974 (2017). We also granted the following motions for leave to appear as amicus curiae: a joint application by the American Civil Liberties Union, the American Civil Liberties Union of New Jersey, and Americans United for Separation of Church and State (collectively, ACLU); and individual applications from the New Jersey Historic Trust (NJHT) and the Becket Fund for Religious Liberty (Becket).
II.
This appeal involves a pure question of law. We therefore review the trial court's grant of summary judgment to defendants de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
To help frame the issues, we begin with an overview of parts of the State and Federal Constitutions that are relevant to this appeal.
A.
The modern Constitution of 1947 includes the Religious Aid Clause. N.J. Const. art. I, ¶ 3. The clause states that no person shall "be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what **554 he believes to be right or has deliberately and voluntarily engaged to perform." Ibid.
The text of the Constitution has deep roots in our State's history. The CONCESSIONS and Agreement of the Lords Propriators of the Province of New Cesarea or New Jersey to and with all and every the Adventurers and all such as shall settle or plant there (Concessions ), dated February 10, 1664, is considered the first document for the governance of what was then a province. See Samuel Smith, The History of the Colony of Nova-Caesaria, or New Jersey 61, 512-21 (1877). It expressly guaranteed religious liberty by recognizing that all persons may "fully have and enjoy ... their Judgments and Conciences in matters of Religion throughout" the province. Concessions ¶ 7, https://www.njstate lib.org/wp-content/uploads/slic_files/imported/Research_Guides/Historical_Documents/nj/CONCESS1.html.
*998 At the same time, the document found that State-sponsored religion was compatible with liberty of conscience, so long as people could also support the religion of their choice. To that end, the General Assembly of the province was granted the power to "appoint such and soe many Ministers or Preachers as they shall think fitt, and to establish their maintenance." Id. ¶ 8.
In the years that followed, charters were enacted for the governance of East and West New Jersey, and each contained a provision in support of religious freedom. See Charter or Fundamental Laws of West New Jersey ch. XVI (1676), http://www.njstatelib.org/wp-content/uploads/slic_files/imported/Research_Guides/Historical_Documents/nj/NJ05A.html; Fundamental Constitutions for the Province of East New Jersey in America art. XVI (1683), http://avalon.law.yale.edu/17th_century/nj10.asp. Despite the new charters, however, the Concessions appear to have retained vitality, at least in East Jersey. See Edward Q. Keasbey, The Early Constitutions of New Jersey, 1 N.J. L. Rev. 20, 32-33 (1915). Also, the lifespan of the two charters was limited by the eventual surrender of both Jerseys to the Crown in 1702. See id. at 33; Carl H. Esbeck, **555 Dissent & Disestablishment: The Church-State Settlement in the Early American Republic, 2004 BYU L. Rev. 1385, 1469 (2004).
In that year, Edward Hyde, Lord Cornbury, was appointed Governor of both New Jersey and New York. Keasbey, 1 N.J. L. Rev. at 34. The Crown provided Cornbury with detailed instructions on how to govern; they included directions on religious liberty: "You are to permit a liberty of conscience to all person (except Papists) so they may be contented with a quiet and peaceable enjoyment of the same ...." Instructions for our Right Trusty and well beloved Edward Lord Cornbury ¶ 51 (1702), http://iplaw.rutgers.edu/statutes/LS/LS8.pdf#page=32.
Notwithstanding the intervening Instructions and charters, the Concessions remained an influential resource for the drafters of the first Constitution in 1776. See Charles R. Erdman, Jr., The New Jersey Constitution of 1776 4 (1929). It appears, though, that the establishment of religion provided for in the Concessions was successful on paper only. Esbeck, 2004 BYU L. Rev. at 1470-71. In reality, "a diverse array of religious traditions" took hold in New Jersey and "produced a spirit of toleration and liberty by the time independence was declared." Id. at 1468. And "in 1776, New Jersey settled any lingering uncertainty concerning church-state affairs by expressly prohibiting in its constitution the establishment of religion." Id. at 1472.
New Jersey's first Constitution, adopted on July 2, 1776, rejected the establishment of and compelled support for religion in two clauses. The first clause contains an express guarantee of the right to freedom from compelled support. The Religious Aid Clause in the 1776 Constitution provided as follows:
That no Person shall ever within this Colony be deprived of the inestimable Privilege of worshipping Almighty God in a Manner agreeable to the Dictates of his own Conscience; nor under any Pretence whatsoever compelled to attend any Place of Worship, contrary to his own Faith and Judgment; nor shall any Person within this Colony ever be obliged to pay Tithes, Taxes, or any other Rates, for the Purpose of building or repairing any Church or Churches, Place or Places of Worship, or for the Maintenance of any Minister or Ministry, contrary to what he believes to be right, or has deliberately or voluntarily engaged himself to perform.
*999 [N.J. Const. of 1776 art. XVIII (emphasis added).]
**556 The second provision contains language similar to the federal Establishment Clause:
That there shall be no Establishment of any one religious Sect in this Province in Preference to another; and that no Protestant Inhabitant of this Colony shall be denied the Enjoyment of any civil Right merely on Account of his religious Principles; but that all Persons, professing a Belief in the Faith of any Protestant Sect, who shall demean themselves peaceably under the Government as hereby established, shall be capable of being elected into any Office of Profit or Trust, or being a Member of either Branch of the Legislature, & shall fully & freely enjoy every Privilege & Immunity enjoyed by others their Fellow-Subjects.
[N.J. Const. of 1776 art. XIX (second emphasis added).]
The two clauses, in combination, reveal that (1) the freedom from being compelled to fund religious institutions through taxation-including the repair of churches-was a grant of personal liberty, and (2) unlike other rights, that freedom was not limited to Protestants.
The fact that New Jersey's first Constitution included a Religious Aid Clause is highly significant. First, it underscores the fundamental nature of the religious freedom clauses in our State's history. The 1776 Constitution is a brief document that outlines the organization of government and the powers of the executive, the legislative council, and the general assembly. The document guarantees only a few distinct rights: the right to vote, id. art. IV; the right to religious freedom, id. arts. XVIII-XIX; the right of an accused to have counsel and call witnesses, id. art. XVI; and the right to trial by jury, id. art. XXII. Viewed in that context, it is telling that the founders devoted careful attention to religious liberty in the first Constitution.
Second, of the twelve states that adopted constitutions from 1776 to 1780, none included a compelled support clause as precise and clear as the Religious Aid Clause. South Carolina adopted a compelled support provision in its second constitution, which it framed exclusively in terms of worship: "No person shall, by law, be obliged to pay towards the maintenance and support of a religious worship that he does not freely join in, or has not voluntarily engaged to support." S.C. Const. of 1778 art. XXXVIII.
**557 Pennsylvania and Vermont adopted compelled support clauses that are similar to each other; both are more expansive than South Carolina's but less detailed than New Jersey's. See Pa. Const. of 1776, Decl. of Rights, art. II ("[N]o man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent ...."); Vt. Const. of 1777 ch. I, ¶ 3 ("[N]o man ought, or of right can be compelled to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience ....").
North Carolina's first constitution, which took effect several months after New Jersey's, contained a provision most like the Religious Aid Clause:
[N]either shall any person, on any pre[t]ence whatsoever, be compelled to attend any place of worship contrary to his own faith or judgment, nor be obliged to pay, for the purchase of any glebe, or the building of any house of worship, or for the maintenance of any minister or ministry, contrary to what he believes right, [or] has voluntarily and personally engaged to perform[.]
*1000 [N.C. Const. of 1776 art. XXXIV.]
Even that relatively detailed clause, though, does not mention the "repair" of houses of worship or ban payment of "taxes." See N.J. Const. of 1776 art. XVIII. New Jersey's Religious Aid Clause thus stands out as particularly specific for its time.
It is also worth noting that among the first states to adopt a constitution, some did not prohibit compelled support. Maryland's first constitution permitted the legislature to collect tax dollars "for the support of the Christian religion." Md. Const. of 1776, Decl. of Rights, art. XXXIII. Massachusetts, the last of the earliest states to disestablish, Esbeck, 2004 BYU L. Rev. at 1458, permitted towns, "at their own expense," to support "the institution of the public worship of God" and "Protestant teachers of ... religion." Mass. Const. of 1780 art. III.
The Religious Aid Clause in New Jersey's first Constitution also stands out in the broader context of the process states followed to ban the establishment of and compelled support for religion. That **558 process reflected the views of some "religious sects [that] opposed establishment on the ground that it injured religion and subjected it to the control of civil authorities. Guaranteed state support was thought to stifle religious enthusiasm and initiative." Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1438 (1990).
"Disestablishment was not an abrupt legal development brought about at the national level as a consequence of the Revolution," but rather a change that "unfolded ... gradually, state by state, and somewhat differently in each state, depending on the state's unique colonial background." Esbeck, 2004 BYU L. Rev. at 1393. The process began in the Middle Colonies such as New Jersey and Delaware, which both adopted constitutions in 1776, and continued through 1833. Id. at 1393, 1457-58. The States thus disestablished individually, in response to their own experiences, well before the religion clauses of the First Amendment were applied to the States.[2]
"Most States that sought to avoid an establishment of religion around the time of the founding placed in their constitutions formal prohibitions against using tax funds to support the ministry." Locke v. Davey, 540 U.S. 712, 723, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004). Most also adopted "a prophylactic rule against the use of public funds for houses of worship." Trinity Lutheran, 137 S.Ct. at 2036 (Sotomayor, J., dissenting). Such prohibitions are commonly known as "compelled support clauses" and were initially "enacted to address the colonists' concern for church and state separation." Ellen M. Halstead, Note, After Zelman v. Simmons-Harris, School Voucher Programs Can Exclude Religious Schools, 54 Syracuse L. Rev. 147, 170 (2004).
**559 Today, twenty-nine constitutions, including New Jersey's, have compelled support clauses.[3] Ten other constitutions simply *1001 prohibit the use of public money in aid of religion.[4]
Thus, although the States eventually included disestablishment and compelled support provisions in their constitutions, see Trinity Lutheran, 137 S.Ct. at 2036 (Sotomayor, J., dissenting), New Jersey did so early on and in quite concrete terms. The Religious Aid Clause's precision stressed New Jersey's departure from the Concessions, see Esbeck, 2004 BYU L. Rev. at 1457, and, perhaps, from authority in other states at the time. The clause also highlighted that New Jersey was at the forefront of a historic and substantial change, and signaled its longstanding and vigorous commitment to religious liberty and freedom from compelled support.
B.
New Jersey adopted its Second Constitution in 1844. The document began with a detailed list of individual rights and, among **560 other things, moved the Religious Aid Clause to a new Article I, Paragraph 3 :
No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretence whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right, or has deliberately and voluntarily engaged to perform.
The words "other" and "the purpose of" do not appear in the Religious Aid Clause in the second Constitution, and no record explains those edits.
A streamlined Establishment Clause, which removed all restrictions to Protestants, can be found at Paragraph 4:
There shall be no establishment of one religious sect in preference to another; no religious test shall be required as a qualification for any office or public trust; and no person shall be denied the enjoyment of any civil right merely on account of his religious principles.
[ N.J. Const. of 1844 art. I, ¶ 4.]
C.
The Religious Aid Clause and the rest of Paragraph 3 were left virtually untouched in the modern Constitution of 1947. A revised Establishment Clause, along with strong non-discrimination language inspired by a similar provision in the New York Constitution, see 3 Proceedings of the Constitutional Convention of 1947 (Proceedings) 451, appears in Paragraphs 4 and 5. The text of those provisions remains unchanged since 1947:
*1002 3. No person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatever be compelled to attend any place of worship contrary to his faith and judgment; nor shall any person be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.
4. There shall be no establishment of one religious sect in preference to another; no religious or racial test shall be required as a qualification for any office or public trust.
5. No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated **561 in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin.
[ N.J. Const. art. I, ¶¶ 3 to 5.]
The above history makes clear that New Jersey's Religious Aid Clause can be traced to the establishment of an independent government in the State in the 1700s. The provision was not inspired by the "Blaine Amendment"; nor was it a response to anti-immigrant or anti-Catholic bias.
"[T]he Blaine Amendment is a remnant of nineteenth-century religious bigotry promulgated by nativist political leaders who were alarmed by the growth of immigrant populations and who had a particular disdain for Catholics." Joseph P. Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J.L. & Pub. Pol'y 657, 659 (1998). The label stems from a failed federal constitutional amendment introduced by Maine Congressman James G. Blaine in 1875. Id. at 670. The proposed amendment nevertheless "propelled" a movement among the states; fourteen "had enacted legislation prohibiting the use of public funds for religious schools" by 1876, and twenty-nine "had incorporated such provisions into their constitutions" by 1890. Id. at 670-73.
As the United States Supreme Court has observed, Blaine Amendments have "a shameful pedigree that we do not hesitate to disavow." Mitchell v. Helms, 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion). New Jersey's Religious Aid Clause long pre-dated the Blaine Amendments and reflected a concern for religious freedom, not discrimination or hostility toward a particular religion.
D.
The parties also reference two other clauses in the State Constitution which provide for funding for historic preservation. See N.J. Const. art. VIII, § 2, ¶¶ 6, 7. Paragraph 6 of Article VIII was adopted in 1996 and amended several times; Paragraph 7 was adopted in 1998. Neither offers any details about the meaning or **562 scope of "historic preservation" projects, and the provisions make no mention of religious institutions.
Amicus NJHT also references two statutes meant to preserve historic resources: the New Jersey Historic Trust, N.J.S.A. 13:1B-15.111 to -15.127, and the Garden State Preservation Trust Act, N.J.S.A. 13:8C-1 to -57. Neither act, however, refers to religious institutions. Cf. 54 U.S.C. § 302905(a) (sanctioning federal grants for the preservation of religious properties listed on the National Register if the grant's purpose "does not promote religion").
*1003 E.
The First Amendment to the United States Constitution, of course, also protects religious freedom. The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." Ibid. Both are discussed below.
Under the Supremacy Clause, the Federal Constitution is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. State "constitutional provisions that conflict with the Federal Constitution are 'without effect.' " Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells, 204 N.J. 79, 103, 7 A.3d 720 (2010) (quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) ).
III.
Plaintiffs argue that the plain language of the Religious Aid Clause prohibits the use of tax revenues to repair churches with active congregations and that no other state constitutional provisions require a departure from that plain-language reading. According to plaintiffs, the challenged grants fall squarely within the Religious Aid Clause's prohibition and are unconstitutional.
In plaintiffs' view, the Federal Constitution does not compel a different result. Plaintiffs assert that the Religious Aid Clause **563 does not violate either the Free Exercise or the Equal Protection Clauses. " Trinity Lutheran's free exercise protections do not apply to this case," plaintiffs contend, because "[b]uilding or repairing houses of worship directly advances religion, even if that is not the government's intent." Plaintiffs distinguish between church buildings that are active houses of worship and facilities that either never were or are no longer used for religious purposes.
In addition, plaintiffs contend that the County's program would be unlikely to pass muster under the federal Establishment Clause.
The ACLU agrees with plaintiffs' interpretation of the Religious Aid Clause and adds that the history of the clause does not support an exception for "historical preservation." The ACLU also submits that no other part of the State Constitution overrides the Religious Aid Clause. Like plaintiffs, the ACLU maintains that the Free Exercise Clause does not compel funding of historic-preservation grants that support religious worship. In addition, the ACLU argues that the federal Establishment Clause would not permit the grants.
The Churches dispute plaintiffs' interpretation of the Religious Aid Clause. They assert that the clause, read in context, permits religious institutions to participate in programs that advance secular government interests and are governed by neutral criteria. According to the Churches, the language of the Religious Aid Clause cannot properly be read in isolation.
The Churches also argue that plaintiffs' interpretation of the Religious Aid Clause violates the First Amendment under Trinity Lutheran. According to the Churches, the grants challenged in this case cannot be distinguished from the program at issue in Trinity Lutheran.
The Churches add that the federal Establishment Clause does not call for a different result. Finally, the Churches maintain that there are no grounds to order them to refund the grants.
**564 Like the Churches, the Morris County defendants focus on Trinity Lutheran and argue that "the First Amendment jurisprudence of the United States Supreme *1004 Court requires" that the grants be upheld. Morris County adds that excluding churches from the list of eligible grant applicants "would force the County to deny religious institutions equal protection under the Fourteenth Amendment to the United States Constitution." They join the Churches in asking the Court to uphold the grant program and affirm the trial court.
Becket agrees with defendants that the grant program here is governed by Trinity Lutheran because it "is a generally available public benefit whose recipients are selected through a competitive grant application process based on secular criteria and ... is open to 'all historic sites within the State' without reference to religious status." Becket stresses that to exclude religious groups from the program "because of their religious status" would "violate[ ] the Free Exercise Clause under Trinity Lutheran." According to Becket, "New Jersey's anti-establishment interest" in this matter "is nil," and any such state interest "would be insufficient because the grant program does not even come close to violating the federal Establishment Clause."
The NJHT represents that it has awarded "grant funds for historic preservation of eligible properties owned by religious institutions for decades." To exclude religious institutions from public benefits "based solely on their religious status," the NJHT asserts, would conflict with the State and Federal Constitutions and related case law. The NJHT contends that "the trial court aptly analogized Morris County's program to Detroit's revitalization program considered in" American Atheists. The NJHT also argues that because the programs have a "neutral public purpose and are administered in a way that ensures secular use of funds," the programs pass muster under the religion clauses.
IV.
The first step in our analysis is to determine whether the historic preservation grants awarded to repair twelve churches **565 violated the Religious Aid Clause of the State Constitution. In light of the plain language of the clause, the question answers itself.
To determine the meaning of a constitutional provision, courts look first to the language the drafters used. State v. Buckner, 223 N.J. 1, 15, 121 A.3d 290 (2015). If it is clear, the words "must be given their plain meaning." State v. Trump Hotels & Casino Resorts, 160 N.J. 505, 527, 734 A.2d 1160 (1999). With that in mind, we return to the text of the Religious Aid Clause:
No person shall ... be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform.
[ N.J. Const. art. I, ¶ 3.]
The clause does not prevent local or State authorities from providing taxpayer-funded police, fire, and emergency services to houses of worship. See Resnick, 77 N.J. at 103, 389 A.2d 944. Nor does it preclude the provision of other services tied to general public safety. Instead, for more than 240 years, the Religious Aid Clause has banned the use of public funds to build or repair any place of worship.
Here, the County awarded $4.6 million to twelve churches to repair active houses of worship-from roofs to bell towers, from stained glass windows to ventilation systems. The use of public funds to pay for those repairs violated the plain language of the Religious Aid Clause.
*1005 The clause does not ask about the governing body's intent-that is, whether the authorities meant to fund repairs to churches, to preserve history and promote tourism, or both. In fact, the change from the 1776 Constitution to the 1844 Constitution removed the bracketed phrase "no taxes ... for [the purpose of] building or repairing any church." Compare N.J. Const. of 1776 art. XVIII, with N.J. Const. of 1844 art. I, ¶ 3. Thus, for most of its existence, the Religious Aid Clause has banned public funding to repair a **566 house of worship without regard to some other non-religious purpose.[5] In short, there is no exception for historic preservation.
Nor is there a basis to distinguish between "restoration" and "repair" under the Religious Aid Clause. The terms mean the same thing. See Oxford English Dictionary (3d ed. 2009) (defining "repair" as "[t]o restore (a damaged, worn, or faulty object or structure) to good or proper condition by replacing or fixing parts; to mend, fix"; and noting that definition was in place before and after 1776).
There is very little case law that construes the Religious Aid Clause, and no case is directly on point. Some cases have focused on the prohibition against "the maintenance of a minister or ministry," not the "repair" of "any church." See Resnick, 77 N.J. at 102-04, 389 A.2d 944 (relating to a school board's permitting a religious group to rent school property for religious instruction and services during non-school hours); Everson, 133 N.J.L. at 366-67, 44 A.2d 333 (Case, J., dissenting) (relating to the use of public funds to reimburse parents for the cost of bus transportation to private and parochial schools).
Thus, nothing in the prior case law requires a departure from the plain language of the Religious Aid Clause. Nor do the other provisions about religion in the State Constitution. See N.J. Const. art. I, ¶¶ 4, 5. Neither Paragraph 4 nor Paragraph 5 addresses the allocation of tax dollars for the repair of active houses of worship, a practice forbidden by the Religious Aid Clause.
**567 The Churches point to a debate at the Constitutional Convention of 1947 in response to the decisions by the Court of Errors and Appeals and the United States Supreme Court in Everson. In that case, the New Jersey high court upheld public funding for transporting students to Catholic parochial schools. 133 N.J.L. at 356, 44 A.2d 333. The United States Supreme Court affirmed that judgment. 330 U.S. at 18, 67 S.Ct. 504.
Opponents of the decisions proposed a Blaine Amendment at the Convention, see 5 Proceedings 789-806, and the proposal did not succeed, 2 Proceedings 1247-49. We do not glean much from the discussion and believe that the debate has little impact on the meaning of the Religious Aid Clause.
The proposal before the Committee on Taxation and Finance centered on school funding. No consideration was given to the interplay between the proposal and other constitutional provisions, including the repair language of the Religious Aid Clause.
*1006 In other words, the debate did not relate to the Religious Aid Clause's prohibition against the use of taxpayer funds to repair churches. Those in opposition instead alluded to the tension between the proposal and the Everson decisions. 5 Proceedings 794-98, 804-06. To be sure, had the debate ended differently, no State constitutional amendment could have overruled the United States Supreme Court's extension of public welfare legislation to religious schools. 330 U.S. at 16, 67 S.Ct. 504. The 1947 Constitution, in fact, added a provision to "provide for the transportation of children ... to and from any school." N.J. Const. art. VIII, § 4, ¶ 3.
Defendants and amici also suggest that Article VIII of the State Constitution affects the plain meaning of the Religious Aid Clause. Article VIII addresses funding for historic preservation and does not conflict with the clause. The relevant provisions do not even mention historic preservation of houses of worship. See N.J. Const. art. VIII, § 2, ¶¶ 6, 7. Because the two Articles do not compete and readily co-exist, there is no need to harmonize their provisions. See **568 State v. Muhammad, 145 N.J. 23, 44, 678 A.2d 164 (1996) ("[C]ompeting clauses of a constitution should be harmonized to give [them] effect ....").
Similarly, Article VIII neither expressly overrides the Religious Aid Clause nor repeals it by implication. See Mahwah v. Bergen Cty. Bd. of Taxation, 98 N.J. 268, 281, 486 A.2d 818 (1985) ("Every reasonable construction should be applied to avoid a finding of implied repealer [of a statute]."); see also City & County of San Francisco v. County of San Mateo, 10 Cal.4th 554, 41 Cal.Rptr.2d 888, 896 P.2d 181, 186 (1995) ("Implied repeals are disfavored. So strong is the presumption against implied repeals that we will conclude one constitutional provision impliedly repeals another only when the more recently enacted of two provisions constitutes a revision of the entire subject addressed by the provisions." (citations and internal quotation marks omitted)). Just the same, the statutes amici cite do not address houses of worship and, in any event, could not override a constitutional guarantee. See N.J.S.A. 13:1B-15.111 to -15.127; N.J.S.A. 13:8C-1 to -57.
We therefore find that the County's grants ran afoul of the State Constitution's Religious Aid Clause.
V.
We turn now to a more challenging question: whether New Jersey's Religious Aid Clause is at odds with the Federal Constitution. If so, the clause cannot stand, notwithstanding its history. Comm. to Recall Robert Menendez, 204 N.J. at 105, 7 A.3d 720 ("Bound as we are to adhere to the supreme law of the land, we cannot permit a provision of the State Constitution to remain in force if it conflicts with the Federal Constitution." (citing Chamber of Commerce of U.S. v. State, 89 N.J. 131, 141, 445 A.2d 353 (1982) (citing, in turn, U.S. Const. art. VI, cl. 2 ))). Based on our understanding of the current state of the law, including the United States Supreme Court's recent decision in Trinity Lutheran, we conclude that the Religious Aid Clause does not conflict with the Free Exercise Clause.
**569 A.
The question before the Supreme Court in Trinity Lutheran was whether the policy of the Missouri Department of Natural Resources "of categorically disqualifying churches and other religious organizations from receiving grants under its playground resurfacing program ... violated the rights of Trinity Lutheran [Church] under the Free Exercise Clause of the First Amendment." 137 S.Ct. at 2017.
*1007 Missouri's Scrap Tire Program offered "reimbursement grants to qualifying nonprofit organizations that purchase playground surfaces made from recycled tires." Ibid. The Department awarded grants "on a competitive basis to those scoring highest based on several criteria." Ibid.
In 2012, the Trinity Lutheran Church Child Learning Center (Center), "a preschool and daycare center" that operated under the auspices of Trinity Lutheran Church, applied for a grant. Ibid. The Department ranked the application fifth among 44 applicants and awarded 14 grants that year, but it declared the Center "categorically ineligible to receive a grant." Id. at 2018. The Department explained "that, under Article I, Section 7 of the Missouri Constitution, the Department could not provide financial assistance directly to a church." Ibid. That section of the Missouri Constitution provides
[t]hat no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.
[ Mo. Const. art. I, § 7.]
Trinity Lutheran filed a complaint against the Director of the Department in Federal District Court and asserted that the Department's policy violated the Free Exercise Clause. Trinity Lutheran, 137 S.Ct. at 2018. The District Court found the case indistinguishable from Locke, 540 U.S. 712, 124 S.Ct. 1307, in which the Court "upheld against a free exercise challenge the State of Washington's decision not to fund degrees in devotional **570 theology as part of a state scholarship program." Ibid. The District Court therefore dismissed the action. Ibid. A majority of the Eighth Circuit panel that heard the appeal affirmed. Ibid.
The Supreme Court reversed. Id. at 2025. The Court's opinion focused on the Free Exercise Clause because, unlike in this case, the parties agreed that the Establishment Clause did not prevent Missouri from awarding the challenged grant. Id. at 2019.
The Court held that the Department's policy violated the Free Exercise Clause by "expressly denying a qualified religious entity a public benefit solely because of its religious character." Id. at 2024.
The Court stressed that "laws that target the religious for 'special disabilities' based on their 'religious status' " must be subject "to the strictest scrutiny." Id. at 2019 (quoting Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ). In that regard, the Court emphasized "that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.' " Ibid. (quoting McDaniel v. Paty, 435 U.S. 618, 628, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (plurality opinion)).
The Court found that "[t]he Department's policy expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." Id. at 2021. By doing so, the Department forced an untenable choice: "participate in an otherwise available benefit program or remain a religious institution." Id. at 2021-22. The Court underscored that "[t]he express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church-solely because it is a church-to compete *1008 with secular organizations for a grant." Id. at 2022.
The Court distinguished between Missouri's policy of excluding religious organizations from the Scrap Tire Program and the scholarship restrictions in Locke v. Davey. Id. at 2022-23. "Washington's **571 restriction on the use of its scholarship funds was different," the Court noted, because the claimant in Locke"was not denied a scholarship because of who he was; he was denied a scholarship because of what he proposed to do-use the funds to prepare for the ministry." Id. at 2023. By contrast, the Court continued, "[h]ere there is no question that Trinity Lutheran was denied a grant simply because of what it is-a church." Ibid.
Of particular note in the case before us, the Court added that, in Locke, "Washington's choice was in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy; in fact, the Court could 'think of few areas in which a State's antiestablishment interests come more into play.' " Ibid. (quoting Locke, 540 U.S. at 722, 124 S.Ct. 1307 ). The Court observed that the funding sought in Locke was "for an 'essentially religious endeavor ... akin to a religious calling as well as an academic pursuit,' and opposition to such funding 'to support church leaders' lay at the historic core of the Religion Clauses." Ibid. (alteration in original) (quoting Locke, 540 U.S. at 721-22, 124 S.Ct. 1307 ).
The Court then returned to the central problem raised by Missouri's program: that Trinity Lutheran's status as a church-not its intended use of the funds-prevented it from participating in the grant program. "[T]here is no dispute that Trinity Lutheran is put to the choice between being a church and receiving a government benefit. The rule is simple: No churches need apply." Id. at 2024.
The Court, however, did not opine on whether that key principle-that "a qualified religious entity" cannot be denied "a public benefit solely because of its religious character," ibid.-extends to religious uses of funding. Footnote 3 of the majority opinion states that "[t]his case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination." Id. at 2024 n.3. Four members of the Court joined footnote 3: Chief Justice Roberts and Justices Kennedy, Alito, and Kagan.
**572 Next, the Court concluded that "Missouri's policy preference for skating as far as possible from religious establishment concerns" could not "qualify as compelling." Id. at 2024. The state's interest, therefore, was "limited by the Free Exercise Clause." Ibid. (quoting Widmar v. Vincent, 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ).
There were three concurring opinions and one dissent. Justices Thomas and Gorsuch, who joined the majority opinion aside from footnote 3, each filed a concurrence in which the other joined. Justice Thomas expressed doubts about the Court's holding in Locke but noted that no party had asked the Court to reconsider it. Id. at 2025 (Thomas, J., concurring). Justice Gorsuch questioned the majority's distinction between "religious status and religious use" to distinguish Locke. Ibid. (Gorsuch, J., concurring). Justice Gorsuch also expressed concern that footnote 3 might be "mistakenly read ... to suggest that only 'playground resurfacing' cases, or only those with some association with children's safety or health, or perhaps some other social good we find sufficiently worthy, are governed by the legal rules recounted in and faithfully applied by the Court's opinion." Id. at 2026.
*1009 Justice Breyer concurred in the judgment but wrote separately to "emphasize[ ] the particular nature of the 'public benefit' here at issue." Ibid. (Breyer, J., concurring in judgment). He noted that in Everson, the Court made clear that a state could not exclude church schools from services like police and fire protection. Id. at 2027. Justice Breyer saw "no significant difference" between that and Trinity Lutheran's "participation in a general program designed to secure or to improve the health and safety of children." Ibid."Public benefits come in many shapes and sizes," Justice Breyer added, noting that he "would leave the application of the Free Exercise Clause to other kinds of public benefits for another day." Ibid.
Justice Sotomayor, joined by Justice Ginsburg, dissented from the opinion as a whole. The dissent first noted that "[t]he Establishment Clause [did] not allow Missouri to grant the Church's **573 funding request because the Church uses the Learning Center, including its playground, in conjunction with its religious mission." Id. at 2028 (Sotomayor, J., dissenting). The dissent declined to accept the parties' agreement that the Establishment Clause posed no issue and remarked that "[c]onstitutional questions are decided by this Court, not the parties' concessions." Ibid.
The dissent then turned to the Free Exercise Clause and focused in particular on the state's interest in denying the grant in question. Justice Sotomayor "looked to history for guidance" and reviewed the "Nation's early experience with, and eventual rejection of, established religion." Id. at 2032. The dissent canvassed efforts across the states "to end the public funding of religion" and the "powerful" reasons for those steps-"all stemming from the basic premise that the practice harmed both civil government and religion." Id. at 2033-35. The dissent concluded that, "as in Locke, Missouri's Article I, § 7, is closely tied to the state interests it protects." Id. at 2038. The dissent found those interests "weighty." Id. at 2041.
Justice Sotomayor disagreed with the Court's decision to use strict scrutiny to evaluate Missouri's program, as well as the Court's application of the test. Id. at 2038-41. The dissent also questioned whether Missouri's Scrap Tire Program, which Justice Sotomayor described as "a selective benefit for a few recipients each year," was a "generally available benefit." Id. at 2040.
B.
Trinity Lutheran's scope is important because the facts of this case extend well beyond playground resurfacing. Indeed, the public funds awarded in this case actually went toward "religious uses." It is clear from the stipulated facts in the record that the Churches all "have active congregations that regularly worship, or participate in other religious activities," and all hold "regular worship services in one or more of the structures that they have used, or will use," taxpayer-funded grants to repair.
**574 In addition to the stipulation, a number of the applications expressly stated that churches sought funding for repairs to continue to conduct worship services. As noted earlier, The Presbyterian Church in Morristown, for example, sought and received a grant to "historically preserve the building allowing its continued use by our congregation for worship services as well as by the community and many other outside organizations that use it on a regular basis." (emphasis added). The Church of the Redeemer sought and received funding to repair the slate roof-"a key structural element that has failed"-to "assist in assuring that the building can continue in its existing use as a church and as an important building in Morristown." (emphasis added). Saint Peter's Episcopal Church of *1010 Morristown similarly requested and received funds to repair the interior of the church tower to "ensure continued safe public access to the church for worship, periods of solitude and meditation during the week, and several concerts throughout the year, as well as the treasures the church and tower contain." (emphasis added).
In certain cases, public funds were used to repair stained glass windows. The First Presbyterian Church of Boonton sought and received grant monies to repair religious imagery above the church altar-a stained glass window that depicts Jesus and two disciples on their walk from Jerusalem to Emmaus. The Church also received funds to repair a second stained glass window above the entry door to the Church.
The First Baptist Church of Ledgewood received funds to develop a preservation plan for several areas of the church building-both exterior and interior space-including the "tower, heating system, and the original stained glass windows," which "increase the beauty and the ambiance of the structure, as viewed from inside and outside." The application noted that a preservation grant "will enable the congregation to continue to provide religious and community activities."
As that grant reveals, restoration awards were not limited to repairs to the exterior of church structures but also to finance **575 repairs to interior space where prayer services were held. Saint Peter's Episcopal Church of Morristown, for example, also received funds for interior work to its ventilation system.
In light of the record in this case, Trinity Lutheran's analysis of Locke is particularly instructive. Once again, as the Court noted, "Davey was not denied a scholarship because of who he was; he was denied a scholarship because of what he proposed to do-use the funds to prepare for the ministry." Trinity Lutheran, 137 S.Ct. at 2023. The same construct applies here: the Churches are not being denied grant funds because they are religious institutions; they are being denied public funds because of what they plan to do-and in many cases have done: use public funds to repair church buildings so that religious worship services can be held there.
This case does not involve the expenditure of taxpayer money for non-religious uses, such as the playground resurfacing in Trinity Lutheran. The appeal instead relates to grants that sustain the continued use of active houses of worship for religious services and finance repairs to religious imagery. In our judgment, those grants constitute an impermissible religious use of public funds. See Comm. for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 774, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (invalidating under the Establishment Clause the "maintenance and repair" provision of a New York law that allowed grants of state funds to nonpublic schools-"given largely without restriction on usage"-on ground that funds could be used to pay "salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities," which would have "a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian ... schools"); Tilton v. Richardson, 403 U.S. 672, 683-84, 689, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (recognizing that funding "chapel[s]" or buildings "otherwise used to promote religious interests" would "have the effect of advancing religion," and therefore striking down under the Establishment Clause the **576 twenty-year limit obligating institutions not to use facilities built with federal grant money "for sectarian instruction or religious worship"). Nyquist and Tilton seem *1011 at odds with defendants' claim that, even when active houses of worship need repairs to continue hosting religious services, "there is nothing inherently religious about roofing."
Trinity Lutheran also read Locke to mean that
Washington's choice was in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy; in fact, the Court could "think of few areas in which a State's antiestablishment interests come more into play." Locke, 540 U.S. at 722 [124 S.Ct. 1307]. The claimant in Locke sought funding for an "essentially religious endeavor ... akin to a religious calling as well as an academic pursuit," and opposition to such funding "to support church leaders" lay at the historic core of the Religion Clauses. Id. at 721-22 [124 S.Ct. 1307]. Here nothing of the sort can be said about a program to use recycled tires to resurface playgrounds.
[ 137 S.Ct. at 2023 (alteration in original).]
As a result, the Court in Trinity Lutheran did not find the state interest in Article I, Section 7 of the Missouri Constitution sufficiently compelling to survive strict scrutiny. 137 S.Ct. at 2024 ; see also Widmar, 454 U.S. at 276, 102 S.Ct. 269.
New Jersey's Religious Aid Clause and the grants awarded in this matter stand in stark contrast to the setting in Trinity Lutheran. As the history of the New Jersey Constitution reveals, the interest the Clause seeks to advance "is scarcely novel." See Locke, 540 U.S. at 722, 124 S.Ct. 1307. The Religious Aid Clause reflects a substantial concern of the State's founders in 1776: to ensure that taxpayer funds would not be used to build or repair houses of worship, or to maintain any ministry. That choice reversed the approval of established religion in the earlier Concessions; it also diverged from the practice of other states that allowed established religion at the time.
The Religious Aid Clause reflects the experience of many of the nation's earliest settlers:
A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government-favored churches .... With the power of government supporting them, at various times and places, Catholics had persecuted Protestants, Protestants had **577 persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted Catholics of another shade of belief, and all of these had from time to time persecuted Jews. In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of non-belief in their doctrines, and failure to pay taxes and tithes to support them.
These practices of the old world were transplanted to and began to thrive in the soil of the new America. The very charters granted by the English Crown to the individuals and companies designated to make the laws which would control the destinies of the colonials authorized these individuals and companies to erect religious establishments which all, whether believers or non-believers, would be required to support and attend. An exercise of this authority was accompanied by a repetition of many of *1012 the old-world practices and persecutions .... And all of [the] dissenters were compelled to pay tithes and taxes to support government-sponsored churches....
.... The imposition of taxes to pay ministers' salaries and to build and maintain churches and church property aroused [the] indignation [of "the freedom-loving colonials"].
It was these feelings which found expression in the First Amendment .... [P]eople [throughout the Colonies] reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group.
[ Everson, 330 U.S. at 8-11, 67 S.Ct. 504 (emphases added).]
As in Locke, New Jersey's antiestablishment interest in not using public funds to build or repair churches or maintain any ministry "lay at the historic core of the Religion Clauses." See Trinity Lutheran, 137 S.Ct. at 2023. New Jersey's historic and substantial interest against the establishment of, and compelled support for, religion is indeed "of the highest order." See McDaniel, 435 U.S. at 628, 98 S.Ct. 1322.
Also as in Locke, the antiestablishment interest New Jersey expressed in 1776 did not reflect animus toward any religion. See Locke, 540 U.S. at 725, 124 S.Ct. 1307. The Religious Aid Clause was enacted before the Federal Constitution; it is not a Blaine Amendment. No history of discrimination taints the provision. Cf. Am. Atheists, 567 F.3d at 301 (noting that **578 Article I, Section 4 of the Michigan Constitution"grows out of the Blaine Amendments, the product of a mid-nineteenth century political movement with no roots in the Religion Clauses of the United States Constitution").
At oral argument and in the briefs, the parties and amici compared the grants in this appeal to Detroit's revitalization program in American Atheists. In that case, the Sixth Circuit upheld grants to several churches as part of a program to "refurbish[ ] the exteriors of downtown buildings and parking lots ... in a discrete section of downtown Detroit" in anticipation of the 2006 Super Bowl. Id. at 281. Projects at three churches were among the ninety-one completed. Id. at 281-84. In total, "[t]he three churches received about $737,000 from the agency," or "6.4% of the $11.5 million in reimbursements." Id. at 284.
The parties recognize that the Sixth Circuit upheld the grants against a challenge under the Establishment Clause. There are other key differences as well. The revitalization grants did not enable religious worship services to continue or fund repairs to religious imagery. In short, the grants did not involve religious uses of funding.
The holding of Trinity Lutheran does not encompass the direct use of taxpayer funds to repair churches and thereby sustain religious worship activities. See 137 S.Ct. at 2024 n.3. We therefore find that the application of the Religious Aid Clause in this case does not violate the Free Exercise Clause.
C.
Had the Free Exercise Clause permitted the awards, we would need to evaluate the grants under the federal Establishment Clause. In that regard, we believe that the grant program poses questions under any articulation of the current standard. See Town of Greece v. Galloway, 572 U.S. ----, 134 S.Ct. 1811, 1818-20, 188 L.Ed.2d 835 (2014) ; Zelman v. Simmons-Harris, 536 U.S. 639, 648-49, 662-63, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) ; Mitchell, 530 U.S. at 844-45, 120 S.Ct. 2530 *1013 (O'Connor, J., concurring); **579 Agostini v. Felton, 521 U.S. 203, 218, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ; Nyquist, 413 U.S. at 770-74, 93 S.Ct. 2955 ; Tilton, 403 U.S. at 677-78, 91 S.Ct. 2091 ; Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) ; McKelvey v. Pierce, 173 N.J. 26, 40-41, 800 A.2d 840 (2002).
Morris County's preservation grants are not one-time awards of the type the Sixth Circuit reviewed in American Atheists. In this case, recipients of grants that totaled more than $50,000 embarked on a thirty-year relationship with the County marked by an easement agreement between each church and local authorities. Grantees were required to negotiate with the County as to when their property would be open to the public. They also had to register their buildings on the National and New Jersey historic registers.
That said, because we need not reach the question in this appeal, we refrain from conducting a detailed analysis of the Establishment Clause.
D.
Finally, we note Morris County's argument that denying grants to the Churches would violate the Equal Protection Clause of the Fourteenth Amendment. Defendants do not offer persuasive legal support for that theory. Courts, in general, approach religious discrimination claims through the First Amendment religion clauses. See Bernadette Meyler, The Equal Protection of Free Exercise: Two Approaches and Their History, 47 B.C. L. Rev. 275, 283-85 (2006) ; see also Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 353-54 (1st Cir. 2004) (rejecting effort to frame a free exercise claim under "the rubric of equal protection" as a "crabbed approach [that] will not wash" because the Free Exercise Clause "defines the scope of the fundamental right to religion incorporated by the Fourteenth Amendment's equal protection guarantee").
The Churches' brief reliance on the Religious Land Use and Institutionalized Persons Act (RLUIPA), **580 42 U.S.C. § 2000cc(b)(1), is also unavailing. The Churches' conclusory assertion that "[t]he County program is a landmarking law" that subjects it to RLUIPA does not persuade us that the statute applies here.
VI.
Today's opinion clarifies and reaffirms the vitality of the Religious Aid Clause in light of more recent federal case law. The County awarded the grants in question from 2012 to 2015. We do not know the extent to which those funds have already been spent in good faith reliance on the grant process and the trial court's ruling. As a result, we do not attempt to unwind the awards at this late date. For all of those reasons, the principles outlined above will apply prospectively.
VII.
We reverse the judgment of the trial court and enter summary judgment in favor of plaintiffs.
JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in CHIEF JUSTICE RABNER's opinion. JUSTICE SOLOMON filed a separate, concurring opinion.

In Luke 24:13-53 (King James), Jesus appears after the Resurrection to two of his disciples as they walk from Jerusalem to Emmaus.

"[T]he Free Exercise Clause was expressly deemed incorporated into the Fourteenth Amendment in 1940 in Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213," while "[t]he Establishment Clause was not incorporated in the Fourteenth Amendment until Everson [,] 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, was decided in 1947." Walz v. Tax Comm'n of N.Y.C., 397 U.S. 664, 702, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

The following states adopted compelled support clauses to their constitutions in the years listed in parentheses; the citations are to the current constitutions: Ala. Const. art. I, § 3 (1819) ; Ark. Const. art. II, § 24 (1836); Colo. Const. art. II, § 4 (1876); Conn. Const. art. VII (1818); Del. Const. art. I, § 1 (1792); Idaho Const. art. I, § 4 (1890) ; Ill. Const. art. I, § 3 (1818) ; Ind. Const. art. I, § 4 (1816) ; Iowa Const. art. I, § 3 (1846); Kan. Const., Bill of Rights, § 7 (1861); Ky. Const., Bill of Rights, § 5 (1792); Md. Const., Decl. of Rights, art. XXXVI (1776); Mich. Const. art. I, § 4 (1835) ; Minn. Const. art. I, § 16 (1857); Mo. Const. art. I, § 6 (1820) ; Neb. Const. art. I, § 4 (1866); N.M. Const. art. II, § 11 (1911); Ohio Const. art. I, § 7 (1803) ; Pa. Const. art. I, § 3 (1776); R.I. Const. art. I, § 3 (1843); S.D. Const. art. VI, § 3 (1889); Tenn. Const. art. I, § 3 (1796); Tex. Const. art. I, § 6 (1845) ; Vt. Const. ch. I, art. III (1777); Va. Const. art. I, § 16 (1830); W. Va. Const. art. III, § 15 (1863); Wis. Const. art. I, § 18 (1848); see also N.H. Const., Bill of Rights, art. 6 (1784).

See Ariz. Const. art. II, § 12 ; Cal. Const. art. XVI, § 5 ; Fla. Const. art. I, § 3 ; Ga. Const. art. I, § 2, ¶ 7 ; Mass. Const., Amends., art. XVIII, § 2 (as amended by Amends., arts. XLVI, CIII); Okla. Const. art. II, § 5 ; Or. Const. art. I, § 5 ; Utah Const. art. I, § 4 ; Wash. Const. art. I, § 11 ; Wyo. Const. art. I, § 19.

The Massachusetts Constitution, by comparison, bars the "grant, appropriation or use of public money ... for the purpose of founding, maintaining or aiding any church, religious denomination or society." Caplan v. Town of Acton, 479 Mass. 69, 92 N.E.3d 691, 693 (2018) (ellipsis in original) (emphasis added) (quoting Mass. Const., Amends., art. XVIII, § 2 (as amended by Amends., arts. XLVI, CIII)). To assess whether a grant of public funds to renovate an active church is constitutional under the Massachusetts Constitution, the Supreme Judicial Court adopted a three-factor test. Id. at 694. The test, in part, requires judges to consider the purpose and effect of the grant. Ibid. The plain language of the New Jersey Constitution does not call for that type of inquiry about the expenditure of public funds to repair a church.